2020 IL App (2d) 180324
No. 2-18-0324
Opinion filed May 15, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CM-109 |
| ALI BORDERS, | ) ) | Honorable James M. Hauser, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1 The defendant, Ali Borders, was convicted of two counts of resisting a peace officer's performance of authorized acts (720 ILCS 5/31-1(a) (West 2018)). He now appeals, arguing that (1) he was not proved guilty beyond a reasonable doubt, because the acts he resisted were not authorized, and (2) he could not be convicted of resisting arrest, because he did not know that he was being arrested until after the arrest occurred. We reverse.

¶ 2                                    I. BACKGROUND

¶ 3 The following facts are drawn from the evidence at trial, which included the testimony of Freeport police officers Donald Heath and Andrew Laurent, the footage from Heath's bodycam,

and Borders's testimony. Where precise times are stated, they are taken from the timestamps on the bodycam footage.

¶ 4    In the early morning of February 10, 2017, someone placed a 911 call but then hung up. At about 5:13 a.m., Heath was dispatched to 479 South Miami Street in Freeport, the location of the call. Heath and another officer arrived at the house about 5:17 a.m. and knocked on the front door.

¶ 5    Alicia Hall, Borders's sister, answered the door. Appearing calm, she said that she needed to get dressed and went back inside. The front porch door locked behind her. Heath commented to the other officer that Hall was "10-96," a term he defined at trial as "irrational" or "somebody with possibly some mental instability." About a minute later, Hall yelled that someone was going out the side window. The two officers began searching outside of the house and Heath called for backup. Someone opened a side door and shut it again, but there was no sign of anyone leaving the house.

¶ 6   Heath could hear a baby crying and another officer heard people arguing. Heath could not tell who was in the house and thought Hall could be hiding someone inside. Earlier that night, Heath had responded to a 911 call about an incident at the same house.  That incident was resolved when Hall told Heath that she had had an argument with Borders, who lived with her, but everything was now fine. Heath testified that he had no reason to believe that Borders was involved in the current situation.

¶ 7 At 5:20 a.m., Heath knocked on the front door again. Other officers arrived, including Laurent; Heath told them that Hall "came to the door like nothing [was] going on" but then went back inside. Heath began walking back and forth near a corner of the house, keeping an eye on the side and front of the house. Hall came out another door, talking on a cell phone. Over the

radio, an officer reported that Hall said everything was fine, denied that anyone else was inside, and would not let the police enter the house. Heath responded, "Then why did she call?"

¶ 8   About 5:24 a.m., Hall appeared on Heath's bodycam, still talking on the phone.   Heath tried to question her. Hall would not directly answer Heath's questions, but she told him that things were fine and that "the problem is removed." Heath told her that the police had to come in to check.  Hall then yelled up to a second floor window for Borders to come down and let her back into the house. She again stated that "the problem" was "removed." At 5:25 a.m., Borders came to the front door to let Hall inside. Laurent was standing nearby, talking with her. As she went inside, someone gave a phone to Laurent.

¶ 9   During Hall's interactions with police outside, the bodycam footage did not show any visible injuries, and Hall, while sounding somewhat upset, did not indicate that she was in fear or needed immediate assistance. At trial, there was no testimony that Hall appeared injured or that the police believed her safety was at risk.

¶ 10 Laurent, who was still near the front door, began talking with Borders. Laurent asked if they could come inside; Heath echoed this request. Borders, who was dressed only in shorts, said that he wanted to put on a shirt but would come back and talk with the officers. He went inside. Heath recounted events to Laurent, including his visit in response to the earlier 911 call. He told Laurent that it was not clear who was involved in the current dispute. He reported that, when he first arrived, everything had been calm until Hall yelled that someone was going out the window.

¶ 11 The cell phone Laurent was holding began to ring and Laurent answered it. Laurent identified himself to the caller (Hall's mother), noted that Hall had called 911 and had just gone into the house, and asked if the caller knew why Hall called 911.  About two minutes after Borders had left to put a shirt on, he returned to the door, and Laurent passed the phone to him.

¶ 12 Laurent then asked Borders whether he wanted to step onto the porch, saying, "I mean, I'm not saying I'm going to go inside or anything." Although he was barefoot, Borders complied, stepping onto the top step of the porch. Borders told Laurent that he had been asleep and did not know what was going on at the house.

¶ 13 About this time, the dispatcher advised Heath that Hall had called 911 again and asked for the police to leave. Hall was told that she had to go talk with the officers before they would leave, but said she did not want to go outside.

¶ 14 At 5:29:33 a.m., Borders asked if he could go in to get shoes and socks. Within the next ten seconds, the following occurred. Borders began turning to go in the door. Laurent said that he wanted Borders to stay outside and he put his hand on Borders's arm to keep him from entering the house. Borders tried to pull away; someone said, "If she says she doesn't want [inaudible] inside"; and Laurent held Borders outside.[1] Heath called over, "She has to come to the door and talk to us." The door closed with Borders still outside.

¶ 15 Held by Laurent on the steps, Borders again asked to go in to get shoes and socks. A second later, Heath began moving quickly toward them, stating, "No, we're done playing games." As he was grabbed by Heath, Borders shouted, "sir" and "lock the door, man." Heath and Laurent forced Borders to the ground, yelling at him to put his hands behind his back. Borders, who was lying face down, shouted that if he had a seizure it would be their fault. Other officers were shouting as well, threatening to use a taser on Borders. Heath and Laurent testified that Borders struggled and did not comply with their commands to stop resisting and put his hands behind his back. Borders denied this, testifying that he did not struggle and that the officers were hampered

---

[1] According to the complaint form filled out by Laurent, Borders was 5'9" tall and weighed 155 pounds.

in bending his arm to handcuff him because Heath was kneeling on his shoulder. It is undisputed that Heath had Borders in handcuffs within 45 seconds of beginning to move toward him.

¶ 16 As Heath escorted Borders to the police car, Borders asked again whether he could get some shoes. Heath told him no. Borders asked what he had done, and Heath replied, "Resisting, right now." Borders asked, "Resisting? I wasn't the one being arrested." Heath said that Borders was the one being arrested, because he was "resisting our attempts to investigate this," adding that Hall "need[ed] to quit calling 911." Heath then complained again that Hall kept calling 911. Borders said that he did not know why Hall had called 911; he had been sleeping. He also denied Heath's accusation that he intentionally shut the door on Laurent. When another officer pointed out that Borders still did not have shoes on, Heath ordered the officer to "get [Borders] out of here." Borders was later taken to a hospital.

¶ 17 On February 14, 2017, Borders was charged via complaint with a single count of violating section 31-1(a) (720 ILCS 5/31-1(a) (West 2016)), "resisting/obstructing a peace officer," by refusing to put his hands behind his back and pulling his arms away. The State later filed an amended information, charging him with two counts of violating the same statute. Count I charged Borders with resisting his arrest by Heath when he "stiffened his arms to prevent arrest." Count II charged Borders with resisting Laurent's performance of an authorized act when he "refused to comply with commands, pulled away, and refused to be handcuffed."

¶ 18 On March 27, 2018, the case proceeded to a jury trial. Heath was the first witness, and while he was on the stand the footage from his bodycam (from his arrival at the house through Borders's arrest) was played for the jury. In addition to the above events, Heath testified to the following. When Heath first arrived at the house, he did not intend to go inside the house, he just wanted to "make contact to find out why 911 was called." However, if there was "any indication

of a disturbance," the police needed to "verify everybody [was] okay." The police did not leave when Hall asked them to, because they knew by then that someone else was inside.

¶ 19 Borders was generally cooperative with police requests. However, Heath decided to arrest him when the door closed, because Heath believed that Borders had deliberately attempted to obstruct the investigation by closing the door. Before arresting Borders, Heath had not ordered Borders to move out of the way, to open the door, or to let them inside. Nevertheless, Heath believed that Borders knew that they were trying to get inside. Heath testified that Borders did not have to let them in, but that closing the door and preventing them from gaining entry constituted obstruction.

¶ 20 Heath also initially testified that, prior to grabbing Borders, he told Borders that he was under arrest and to put his hands behind his back. However, Heath was impeached by the bodycam footage, which showed that, before grabbing Borders, Heath never told Borders that he was under arrest. Instead, Heath said "we're done playing games," moved toward Borders, and then grabbed him to lift him off the steps and put him on the ground, meanwhile telling Borders to put his hands behind his back. Only after Borders was handcuffed did Heath tell him that he was under arrest.

¶ 21 Laurent testified next. Soon after he arrived at the house that morning, he decided that the police needed to enter the house to verify that everyone was okay. However, he did not attempt to enter the front door while he was interacting with Hall and Borders, even though it was open a few times when he was near it and Borders kept it propped open during their conversation. Borders repeatedly told Laurent that he had been asleep and did not know what had been going on in the house. Laurent testified that Borders turned to go back inside after his sister Hall told him to do so. (Neither Heath nor Borders testified to this, and the bodycam did not record any such statement by Hall.) At that point, Laurent told Borders to stay outside and he put his hand on Borders's arm

to restrain him from entering the house. Laurent testified that he was trying to detain Borders, not arrest him.[2]

¶ 22 Because Borders was still trying to go inside, Laurent and Heath lifted Borders up and "swung his torso to the ground." Borders put his arms under his body on the ground. Laurent believed that Borders was doing this to avoid being handcuffed, so Laurent punched Borders in the back where he lay to "distract" him and enable the other officers to handcuff him. Laurent testified that he was not sure how the officers were able to get Borders handcuffed because "it happened so fast." After Borders was handcuffed, someone told Borders that he was under arrest.

¶ 23 Borders was the final witness. He was 21 years old. He testified that he had been in bed asleep when the police arrived on the morning of the incident. He woke to the sound of his sisterHall throwing rocks at his window and calling his name. He did not know what was going on. Wearing only a pair of shorts, he came downstairs to see why she was calling his name. Hall was standing outside near the front porch, talking with Laurent. When Borders got near the front door, an officer told him to come outside and that, if he did not, they would come in. He complied to avoid them entering the house. Hall walked past him as he opened the door. The police did not try to stop her or try to enter the house. Borders asked if he could put on a shirt and Laurent agreed to that.

---

[2] Laurent's specific testimony on this point was: "You know, sometimes people are placed in handcuffs without being under arrest. And I didn't want to arrest him. *** I just wanted to detain him in handcuffs was my intent." Upon later being asked whether, when Borders was asked to put his hands behind his back, he was being arrested, Laurent answered, "No. He was going to be detained."

¶ 24 Borders then returned and stepped outside. Laurent asked him repeatedly what was going on, and Borders explained repeatedly that he did not know because he had just woken up. Borders then asked Laurent if he could put on socks. Borders reached for the door and Laurent grabbed his arm. Borders let go of the door and it closed.

¶ 25 Laurent began trying to move Borders and throw him off the porch. Borders described Heath's approach this way: "The other guy came around. I heard him saying something, didn't know what he was saying at the time." The two officers threw him off the porch. He landed face down on some bricks lining the flower bed there and people began hitting him on his back, his face, and the back of his head. Heath had hold of Borders' left arm and was bending it behind Borders while he had his knee on Borders' shoulder "where it rotates." Borders was yelling, because all of this hurt.

¶ 26 Borders testified that no one told him to come down the stairs or get out of the way before he was grabbed and taken to the ground. After he was on the ground, while he was being hit, someone was yelling "Stop resisting and put your hands behind your back." Borders testified that his hands were behind his back at that point but the officers could not bend his arms enough to handcuff him because Heath's knee was on his shoulder. Borders denied that he locked his arms or struggled to prevent arrest. He lost consciousness once when he was in the police car, and he was shaking and could not talk when he got to the booking room. He was taken to the hospital.

¶ 27 The jury found Borders guilty on both counts, and he was sentenced to four days in jail and one year of conditional discharge. He now appeals.

¶ 28                                    II. ANALYSIS

¶ 29 On appeal, Borders contends that the evidence was not sufficient to prove him guilty beyond a reasonable doubt of either charge.

¶ 30 In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. However, although the determinations of the trier of fact are given great deference, they are not conclusive. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will set aside a criminal conviction if the evidence as to any element of the offense "is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Id.*

¶ 31                    A. Count II—Laurent/Resisting or Obstructing

¶ 32 We begin by addressing whether the evidence sufficiently supports Borders' conviction of resisting or obstructing Laurent in the performance of an authorized act. Borders was charged with violating section 31-1(a) by refusing to comply with commands, pulling away, and refusing to be handcuffed.

¶ 33 A person commits the offense of resisting or obstructing if he or she "knowingly resists or obstructs the performance *** of any authorized act" by a person known to be a peace officer. 720 ILCS 5/31-1(a) (West 2018). As can be seen from the statute's language, a conviction of this offense requires that the defendant knew both that (1) the person obstructed or resisted was a peace officer and that (2) the defendant's actions would obstruct or resist the officer's authorized act.

*Id.*; see also *People v. Kotlinski*, 2011 IL App (2d) 101251, ¶ 39. Innocent or inadvertent conduct does not violate section 31-1(a). *People v. Raby*, 40 Ill. 2d 392, 398 (1968). Further, the officer must be engaged in an "authorized act within his or her official capacity." 720 ILCS 5/31-1(a) (West 2018). If the officer was not engaged in an authorized act when the resistance or obstruction took place, the defendant has not violated section 31-1(a) and any conviction of that offense must be reversed. *People v. Slaymaker*, 2015 IL App (2d) 130428, ¶ 12.

¶ 34 The issue is whether the evidence, viewed in the light most favorable to the State, was sufficient to permit the jury to find that Borders knowingly resisted or obstructed Laurent's performance of an authorized act by refusing to comply with commands, pulling away, and refusing to be handcuffed. At trial, the only commands that Laurent testified he gave Borders occurred after Borders asked to put on socks and turned to go inside—Laurent told him to stay outside and later to put his hands behind his back. The other alleged conduct that was the basis of the charge—pulling away and refusing to be handcuffed—occurred during this same interaction. The State argued that all of this conduct violated section 31-1(a) because it prevented Laurent from going inside the house. We consider whether Laurent was authorized to enter the house and, if he was, whether he was authorized to seize Borders to accomplish that entry.

¶ 35 The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Unlawful physical entry into the home is the "chief evil against which the fourth amendment is directed." *People v. Jones*, 2015 IL App (2d) 130387, ¶ 13 (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)). "Accordingly, absent exigent circumstances, the police may not enter a private residence to make a warrantless search or arrest." *Id.* "Thus, an officer's entry into the defendant's

home in violation of the fourth amendment is not an 'authorized act' for purposes of section 31-1 [citation], even if the entry is undertaken pursuant to an official investigation." *Id.* ¶ 11.

¶ 36 The State argues that, here, the police were permitted to enter Borders's and Hall's home without a warrant under the "emergency aid" exception to the fourth amendment. That exception allows police to enter a residence if (1) they have reasonable grounds to believe that an emergency is at hand and that their immediate aid is necessary to assist in the protection of life or property, and (2) there is a reasonable basis for connecting that emergency with the residence. *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009). "The reasonableness of the officer's belief concerning the existence of an emergency is determined by the entirety of the circumstances known to the officer at the time of entry." *Id.*

¶ 37 As the State points out, the emergency-aid exception has been invoked in cases involving 911 calls. See, *e.g.*, *People v. Greene*, 289 Ill. App. 3d 796, 801 (1997). However, even when there has been a 911 call, the exception still requires that, at the time of the entry, the officer had a reasonable belief based on all the circumstances known to him or her that an emergency existed and immediate aid was necessary to protect life or property. *Id.* at 801-02.

¶ 38 The State asserts that Heath and Laurent reasonably believed that an emergency required their entry into the house, stressing that the officers responding to the 911 hang-up did not know what the situation was, Hall's shout that someone was going out a window created a sense of chaos, and the argument heard by one officer indicated that others beside Hall were likely inside the house. Moreover, Hall refused to answer most of the officers' questions when she came outside and then she went back inside, preventing them from investigating further.

¶ 39 However, the evidence also shows that Heath and Laurent believed that Hall was the person who had placed the 911 call and that they did not suspect Borders of any criminal activity with

respect to Hall. During Hall's perambulations outside the house, they had several minutes to observe her and could see that she was not injured. They were aware that Hall had asked for them to leave. When Borders came to the door, he voluntarily agreed to speak with them, and he voluntarily returned to the door to do so after going inside to get a shirt. By the time that Borders turned to go back inside to get socks and shoes, the police had been at the premises for about 15 minutes, without attempting to enter the house. In light of this evidence, we conclude that, when Laurent ordered Borders to remain outside and seized Borders, he did not have a reasonable basis for believing that an emergency required his entry into the house to protect life or property.

¶ 40   Our determination is supported by the case law.  For instance, in *People v. Koester*, 341 Ill. App. 3d 870 (2003), officers responded to a residence from which someone had placed a 911 call but then hung up. The responding officer testified that a 911 hang-up was treated as an emergency because of the concern that a victim who had been assaulted might be prevented from completing the call or coerced into denying it. *Id.* at 872. When the officer arrived, there were several cars parked nearby and it appeared that a party was going on in the house. The officer knocked, and a resident answered. The resident said that the caller had likely been his sister and that she was fine. He refused to allow the police to enter without a warrant. The officer called his supervisor, who arrived 10 to 15 minutes later. While waiting for the supervisor to arrive, there was no yelling, screaming, or sounds of violence from inside the home, and the resident remained outside with the police. After speaking with a state's attorney, the officer told the resident that police officers had the authority to enter to make sure everyone was all right. *Id.* at 872-73. However, the officers did not take any first aid kit into the house and instead brought in portable equipment for breath testing.  The officers entered and searched the house, discovered several high

school students, and charged them with underage drinking. The trial court ruled that the entry had violated the fourth amendment and it suppressed the evidence. *Id.* at 874.

¶ 41 We affirmed, finding that "the officers' purported belief that an emergency situation existed in the home [was] belied by the record," including the officers' failure to ask to speak to the 911 caller, the wait of almost 30 minutes before entering the home, and the fact that the equipment brought into the home was oriented toward testing for alcohol consumption instead of first aid or safety. *Id*. at 875. Thus, the grounds for the emergency-aid exception were not present. *Id*.

¶ 42 The facts supporting reversal in *Jones*, 2015 IL App (2d) 130387, were at least as compelling as those presented here. In that case, a police officer responded to a report of a possible domestic disturbance. When the officer arrived, he saw the defendant and a woman arguing on the enclosed front porch. The officer knocked on the porch door and then opened it and entered the porch, saying that he was there to investigate a domestic disturbance. *Id.* ¶ 4. The defendant refused the officer's requests to step outside and swore at the officer, saying that there was no problem and that the officer should leave. *Id.* ¶ 5. The officer could see the woman and observe that she had no visible injuries. Just as in this case, at trial the officer testified that he was concerned for everyone's safety and did not know who was inside the house. *Id.* ¶ 6. When the defendant began walking toward the front door of the house, the officer grabbed him to stop him. The defendant pulled away and the officer told him that he was under arrest for resisting. *Id.* ¶ 7. The defendant continued to struggle and was eventually subdued by several officers.

¶ 43 We reversed the defendant's conviction of violating section 31-1, finding that the police officer's continued presence in the home, when there was no evidence of any emergency or need for immediate assistance, violated the fourth amendment:

"While [the officer] was undoubtedly authorized to conduct some initial investigation, in doing so he found no evidence of domestic violence, or of any other offense for that matter. The report that prompted the investigation stated only that a verbal argument was occurring, accompanied by the sound of objects breaking. [The officer], too, heard arguing and things breaking, but, even after entering defendant's home, he discovered no evidence of violence. *** [T]he ostensible victim[ ] had no visible injuries and did not request assistance. [The officer]'s authority to remain in defendant's home effectively ended at that point. His remaining in the home in an attempt to detain defendant was an unauthorized act." *Jones*, 2015 IL App (2d) 130387, ¶ 16.

Because the officer's presence in the home was unauthorized (as was his attempt to detain the defendant), the defendant's resistance and obstruction did not violate section 31-1. See also *City of Champaign* v. *Torres*, 214 Ill. 2d 234, 244 (2005) ("section 31-1 would not prohibit a person from using reasonable force to prevent [an] officer from making an unconstitutional entry into his or her [home]").

¶ 44 Here, as in *Koester* and *Jones*, there was no evidence of any imminent threat to life or property. The mere fact that neither Hall nor Borders would allow the police to enter the house was not, in itself, suspicious or grounds for believing that the situation was an emergency, because their refusal was their constitutional right. "[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Kentucky v. King*, 563 U.S. 452, 470 (2011). Although Hall's shout about someone going out a window caused confusion, after that the police were able to speak with Hall as well as Borders and confirm that Hall displayed no injuries and was not restrained inside. Hall clearly conveyed to them that she did not want their assistance and

wanted them to leave. As further evidence that the police themselves did not view the situation as an emergency involving personal safety, the police did not attempt to enter the house although the front door was opened several times when they were nearby. Laurent's decision to issue commands to Borders and restrain him from reentering the house occurred after the police had been at the house for about 15 minutes. Given these facts, we find that, as in *Koester* and *Jones*, the State has not established that the emergency-exception applies or that Laurent was engaged in an authorized act of seeking entry into the house when the charged conduct occurred. Accordingly, Borders had the right to ignore Laurent's command to stay outside.

¶ 45 Nor did Laurent have the authority to detain Borders and subsequently seize him. If the police suspect that a person has committed or is committing a crime, they may briefly detain the person for investigatory purposes. *Terry v. Ohio*, 392 U.S. 1, 22 (1968); see also *People v. Thomas*, 198 Ill. 2d 103, 108-09 (2001). To justify such a detention, "[t]he officer must have observed unusual conduct, leading to a reasonable, articulable suspicion that the person has committed or is about to commit a crime," and the officer's suspicions must amount to "more than a mere hunch." (Internal quotation marks omitted.) *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 34. Otherwise, "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. [Citation.] And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' " *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

¶ 46 Here, Borders's refusal to allow a warrantless entry into his home and his attempt to reenter that home to put on socks and shoes do not meet the threshold of "objective justification needed for a detention or seizure." *Id.* Laurent never testified that he believed Borders had committed or

was committing a crime, and indeed on appeal the State does not attempt to justify Laurent's seizure of Borders.

¶ 47 The State instead argues that Laurent was authorized to arrest Borders (and that, even if the arrest was unconstitutional, Borders could not lawfully resist it). The problem with this argument is that Laurent himself testified that he was *not* attempting to arrest Borders. "[W]here a police officer is not trying to make an arrest, section 31-1 would not prohibit a person from using reasonable force to prevent the officer from making an unconstitutional entry" into his or her home. *Torres*, 214 Ill. 2d at 244.

¶ 48 Laurent testified that, when he placed his hand on Borders's arm to prevent him from entering the house and later told Borders to put his hands behind his back, he wished to restrain Borders to allow the police to more easily search the house without interference. As discussed, however, the police were not authorized to enter the house and search it. See *Jones*, 2015 IL App (2d) 130387, ¶ 16; *Koester*, 341 Ill. App. 3d at 875. Laurent likewise was not authorized to seize Borders to effectuate any such entry and search. *Jones*, 2015 IL App (2d) 130387, ¶ 16 (officer's attempts to restrain defendant from entering his home were not authorized where officer himself had no authority to enter home and had neither probable cause nor a reasonable, articulable suspicion that a crime was being committed); see also *Torres*, 214 Ill. 2d at 244.

¶ 49 As Laurent was not authorized to detain or seize Borders, Borders was at liberty to ignore Laurent's commands to stay outside and put his hands behind his back, to pull away from Laurent, and to resist being handcuffed for the purpose of temporary detention. *Shipp*, 2015 IL App (2d) 130687, ¶ 49 ("where a police officer is not trying to make an arrest, section 31-1 does not prohibit resistance"); *Jones*, 2015 IL App (2d) 130387, ¶ 16. Accordingly, the verdict against Borders on count II must be reversed. *Slaymaker*, 2015 IL App (2d) 130428, ¶ 12.

¶ 50                                    B. Count I—Heath/Resisting Arrest

¶ 51    As we have noted, a conviction under section 31-1(a) requires that the officer be engaged in an authorized act when the resistance or obstruction occurs. When the action being taken by an officer is an arrest, however, the analysis is slightly different. Under section 7-7 of the Criminal Code of 2012 (Code) (720 ILCS 5/7-7 (West 2018)), "[a] person is not authorized to use force to resist an arrest which he knows is being made *** by a peace officer ***, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." Accordingly, an arrest is considered an "authorized act" for the purposes of section 31-1 even if it was an unlawful arrest. *Torres*, 214 Ill. 2d at 242. " 'Consequently, resistance of even an unlawful arrest by a known officer' is a violation of the statute." *Id.* (quoting *People v. Locken*, 59 Ill. 2d 459, 465 (1974)).

¶ 52 In this case, all of the officers were in uniform when they encountered Borders. Further, the evidence shows that, although Heath did not suspect Borders of being involved in any criminal conduct and did not initially plan to arrest anyone, by the time Heath said "we're done playing games," he intended to arrest Borders. (This is in contrast to Laurent, who testified that he did not seek to arrest Borders but merely to detain him securely so that the police could search the house more easily.) Thus, if Borders knowingly resisted an attempt by Heath to arrest him, he was properly convicted of count I, which charged him with resisting arrest by stiffening his arms.

¶ 53    Borders raises several arguments on this issue. First, he argues that he did not know that he was being arrested until after Heath grabbed him and began trying to handcuff him. He also argues that he did not knowingly resist that arrest—that is, any resistance was both momentary and inadvertent (because it took him a moment to realize that he was being arrested, and his arms were in a position where they could not easily be bent). He points out that no one told him that he

was under arrest until after he was already handcuffed on the ground.[3] Further, the entire effort to handcuff him was over in less than 45 seconds. He argues that the evidence does not show that he was consciously aware that he was under arrest and thus does not establish that he knowingly resisted the arrest. See 720 ILCS 5/4-5 (West 2016) (a person acts "knowingly" if "he or she is consciously aware *** that those circumstances exist"). He notes that, even after he was handcuffed and was being led to the police car, he expressed confusion about what he had done wrong and the fact that he had been arrested. The State responds that there was a struggle lasting more than 30 seconds before Borders was handcuffed and that any physical struggle is sufficient to constitute resistance, because a person cannot resist even an unlawful arrest.

¶ 54 The State first contends that the brevity of the struggle between Borders and the police is not dispositive. It notes that, in *People v. Thompson*, 2012 IL App (3d) 100188, ¶ 14, a conviction of resisting arrest was sufficiently established by evidence that the defendant threw his elbows at the arresting officer's head and that it took between 30 and 45 seconds for him to be handcuffed. The most obvious way in which *Thompson* is distinguishable is that there the arresting officer told the defendant that he was under arrest but the defendant continued to struggle after that. *Id.* ¶¶ 6,

---

[3] The State disingenuously attempts to argue that the evidence allowed the jury to find that Heath told Borders that he was under arrest before handcuffing him. This is not an accurate summary of the evidence. Heath's initial testimony that he "approached" Borders and "advised him he was under arrest" was thoroughly impeached. Heath first admitted that he might not have made that statement. Then, after viewing the relevant portion of the bodycam footage (which does not contain any statement about arrest) and being asked at what point he told Borders that he was under arrest, Heath affirmatively stated, "I did not." In our view, this evidence did not permit the jury to conclude that Heath actually told Borders that he was under arrest before handcuffing him.

7. Thus, the moment when the defendant became aware that he was being arrested was clearly identifiable. Here, by contrast, no one told Borders that he was under arrest until the struggle was over and he was lying on the ground handcuffed. One cannot knowingly resist an arrest until one knows that it is occurring. We also note that in *Thompson* the evidence showed that the entire course of events actually took longer, because there was testimony that it took "30 to 45 seconds, and the assistance of another officer, to gain control of defendant *after the two went to the ground*," which itself occurred after the defendant had been told that he was under arrest and placed in a hold. (Emphasis added.) *Id*. ¶ 6. Here, by contrast, the entire course of events—from Heath's statement that he was "done playing games" to Borders's being handcuffed—took less than 45 seconds, and the starting point of any period of resistance was unclear because no one told Borders that he was under arrest until after he was handcuffed.

¶ 55  The State also argues that Borders being told to put his hands behind his back was sufficient to establish that he knew he was being arrested. Further, he was seized by uniformed officers, so he should have understood that he was under arrest.

¶ 56 The statement, "you are under arrest" is not absolutely necessary to create the knowledge that one is being arrested. "Although the intention to arrest must be communicated, and defendant's understanding of that intent is a factor to be considered, '[t]he test must be not what the defendant *** thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " *People v. Howlett*, 1 Ill. App. 3d 906, 910 (1971) (quoting *Hicks v. United States*, 382 F.2d 158, 161 (D.C. Cir. 1967)); see also *People v. McKinney*, 62 Ill. App. 3d 61, 67 (1978).

¶ 57 The State argues that Borders should have known that he was under arrest when uniformed officers told him to put his hands behind his back. In support, the State cites *People v. McCoy*,

378 Ill. App. 3d 954, 956-57 (2008), and *Thompson*. In both of these cases, however, the police told the defendants that they were under arrest before the resistance occurred. Because there was no real doubt about whether those defendants' resistance was knowing, these cases are inapposite. The State also cites *McKinney*. There, however, the defendant responded to police requests to show himself by pulling out a gun and pointing it at an officer. *McKinney*, 62 Ill. App. 3d at 63. Because this was a criminal act in itself, the defendant could have had no reasonable belief that he would not be immediately arrested, and the "substantial struggle" that occurred constituted knowing resistance to an arrest. Lastly, the State cites *People v. Bahnfleth*, 233 Ill. App. 3d 289 (1992), and *People v. Monteleone*, 2018 IL App (2d) 170150, for the general proposition that knowledge of an arrest can be proven by circumstantial evidence. While we have no quarrel with this proposition, these cases do not involve resisting arrest and their facts are unlike those in this case. See *Bahnfleth*, 233 Ill. App. 3d at 292 (where defendant was transported to police station and was told he was being charged with driving under the influence, he had been arrested); *Monteleone*, 2018 IL App (2d) 170150, ¶ 26 (defendant charged with drug offenses asserted he did not know that the drugs he possessed and distributed contained a controlled substance; no issue of arrest involved). They therefore offer no real support for the State's arguments about whether and when Borders should have known that he was under arrest.

¶ 58    More helpful is *People v. Ostrowski*, 394 Ill. App. 3d 82, 98 (2009), in which the defendant resisted arrest for three or four minutes after police told him that he was under arrest, first walking away from the police and then struggling with them. Importantly, we found that, because the police approached the defendant from behind and the defendant was intoxicated, it likely took him "a minute or two to comprehend what was happening." *Id.* However, after that period of dawning

awareness, the defendant continued to resist being handcuffed. We therefore found that the evidence sufficiently established that he knowingly impeded police efforts to arrest him. *Id.* at 99.

¶ 59 Here, by contrast, it was 5:30 in the morning and there was no evidence that Borders had been awake for more than five minutes when, despite the fact that he was voluntarily cooperating with police requests that he speak with them, he was restrained from reentering his home. Less than 10 seconds later, without telling him that he was under arrest, Heath and Laurent grabbed him and forcefully put him on the ground, telling him to put his hands behind his back. Moreover, Borders had not committed any crime, nor did the police have probable cause to believe that he had committed one. He was in handcuffs less than 45 seconds after Heath began moving toward him. Given all of this, we think that it would have taken a reasonable person in Borders's situation most if not all of that time to realize that he was being arrested. We note that, as in *Ostrowski*, Borders was grabbed from behind. Further, unlike in *Ostrowski* and the cases cited by the State, Borders was not told that he was under arrest until after he was handcuffed. Even viewed in the light most favorable to the State, the evidence did not establish beyond a reasonable doubt that Borders knowingly resisted arrest. We therefore reverse his conviction on count I, in addition to our previous reversal of his conviction on count II.

¶ 60                                    III. CONCLUSION

¶ 61 For the reasons stated, the judgment of the circuit court of Stephenson County is reversed.

¶ 62 Reversed.

---

**No. 2-18-0324**

---

| | |
|---|---|
| **Cite as:** | *People v. Borders*, 2020 IL App (2d) 180324 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Stephenson County, No. 17-CM-109; the Hon. James M. Hauser, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Anthony J. Santella, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Carl H. Larson, State's Attorney, of Freeport (Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---