2024 IL App (2d) 230373-U
No. 2-23-0373
Order filed July 29, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CM-328 |
| CHALMERS K. GILMORE, | ) ) ) | Honorable William G. Engerman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse defendant's conviction of resisting a peace officer because the State failed to prove that defendant knew he was being arrested when he resisted the police officers' attempts to handcuff him.

¶ 2    After a bench trial, defendant, Chalmers K. Gilmore, was convicted of resisting a peace officer (720 ILCS 5/31-1(a) (West 2020)) and sentenced to 12 months' conditional discharge. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt. We reverse.

¶ 3                                    I. BACKGROUND

¶ 4    The complaint filed by Aurora police officer Ryan Zuniga alleged that, on February 25, 2022, defendant knowingly resisted Zuniga's performance of an authorized act within his official capacity by (1) refusing a lawful order to step back from Zuniga, (2) making contact with Zuniga's right arm, and (3) refusing to place his hands behind his back after being told that he was under arrest.

¶ 5    At trial, Zuniga testified as follows. On February 25, 2022, at approximately 5 p.m., he drove to a house in Aurora to investigate a domestic disturbance. Officers Omar Ortiz and Dispensa (first name not given) arrived separately. The officers were in full uniform. When Zuniga arrived, Dezi Gilmore, the homeowner, admitted him and said that her son, defendant, was inside. Zuniga separated Dezi and defendant and spoke to Dezi. She told him that defendant and her husband (defendant's father) had been in a confrontation. Zuniga went upstairs with Dezi to talk. He heard defendant repeatedly and loudly demand the other officers' badge numbers and tell them to leave the house. Zuniga shouted to defendant that he would not leave until he completed his investigation. Defendant demanded his badge number and told him to leave.

¶ 6    Zuniga testified that he went downstairs and stood at arms' length from defendant, who was holding a phone to record the incident. Defendant demanded that Zuniga get out. The officers started to walk out the door. Dezi mentioned that she had evicted defendant, so the officers turned around and approached her. Zuniga told Dezi that she could not evict defendant without court papers. Defendant stepped in front of the officers and prevented Zuniga from talking to Dezi. Zuniga ordered him to back away, but defendant did not. Zuniga extended both arms and escorted defendant into the kitchen. After Zuniga "cleared some space between [him] and [defendant," defendant approached Zuniga again. Zuniga extended his right hand to "gain distance from [defendant]" and told him that he would be arrested if he did not take a step back from Zuniga.

Defendant then slapped Zuniga's hand away. Zuniga responded by grabbing defendant's right arm, escorting him to a wooden bench inside the kitchen, and advising him that he was under arrest. Zuniga ordered defendant to place his hands behind his back, but defendant refused and tensed his arms. Zuniga and the other officers then forced defendant's arms behind his back. Defendant struggled against the officers and was "almost flailing his body." About half a minute later, the officers secured defendant and took him outside to await transportation.

¶ 7     The State published part of a video recorded by Ortiz's body camera during the encounter. That segment began with Zuniga and Dezi descending the stairs from the second floor. Defendant told the other two officers to get out. Dezi reached the bottom of the stairs first and ordered defendant to get out. When Zuniga reached the bottom of the stairs, he, Ortiz, and Dispensa approached the front door. Dezi told them that defendant had been evicted. Zuniga turned around, reentered, and faced defendant. He asked Dezi whether she had the necessary court papers to evict defendant. Meanwhile, defendant pointed toward the door and repeatedly told Zuniga, "You're dismissed."

¶ 8     Next on the video, Zuniga stepped toward Dezi as they spoke about whether defendant could be evicted. Defendant stepped between them, preventing Zuniga from speaking with Dezi. Zuniga told defendant to step back. Defendant told Zuniga to step back from him and to leave. Zuniga pointed a finger at defendant and told him that he was in the middle of an investigation. Defendant again told Zuniga to leave. Zuniga touched defendant's left arm; defendant said, "Don't touch me, dude." Zuniga took defendant's right arm and pushed him a short distance into the kitchen. He followed defendant there. Dezi could be seen behind defendant.

¶ 9     Next on the video, Dezi came out from behind defendant and went behind Zuniga. Zuniga touched defendant's left arm, and defendant told him, "Don't put your f***[ ] hands on me, n***[ ]

don't touch me, dude." As defendant held his arms over his head, still clutching his phone, Zuniga partially extended his right arm and pointed his right index finger at defendant. He told him, "You come up on me again, you're going to jail." Zuniga put his right hand on defendant's chest. Defendant grasped Zuniga's arm above the wrist and pushed it away. Zuniga then pushed defendant onto a bench in the kitchen. He ordered him four times to put his hands behind his back. Defendant refused. Zuniga and another officer attempted to handcuff defendant, but he sat with his left arm fully extended and his palm flat on the bench. The officers pushed him onto the floor and managed to handcuff him. They escorted him out of the house.

¶ 10 Zuniga reiterated on cross-examination that, after the officers started to exit the home, Dezi called out that defendant had been evicted. Zuniga returned and asked her whether she had eviction papers. At some point, defendant stepped in front of Zuniga, who told him to step away from him. At this point, Zuniga was not trying to arrest defendant. Nor was he trying to arrest defendant when, a few seconds later, inside the kitchen, he touched defendant a second time (the first time he touched defendant was when he escorted him into the kitchen). But, after defendant pushed away Zuniga's hand, he initiated the arrest. Zuniga's testimony continued:

"Q. And, in fact, Officer Zuniga, you never told [defendant] that he was under arrest, correct?

A. I don't believe—I believe, as we were putting him into custody, I told him that he was under arrest.

Q. So it's your testimony today that you told him that he was under arrest in those exact words?

A. I don't know if it was in those exact words, but I—I don't recall if, while I was placing him into custody, if he was under arrest. I don't recall that."

¶ 11    Zuniga testified that, after defendant slapped his hand, he escorted defendant to the bench. A few seconds later, he told defendant to put his hands behind his back.  At that time, Zuniga "had a grasp on him" and defendant was "tensing his muscles and almost kind of like standing up stern inside the bench."

¶ 12    On redirect, Zuniga testified:

"Q. And going up to the point where you had contact with [defendant] in the kitchen, you testified earlier that he had put his hand on you and had swatted your right arm away with his right arm; is that correct?

A. Yes, ma'am.

Q. And at any point did you ever tell him that if he behaved that way, he would be under arrest, that he would go to jail, anything like that?

A. I told him multiple times *** I believe my exact words were if he didn't take a step back from me, then he would be going to jail, yes.

Q. And then once you—once he made contact with your person and you had escorted him onto the bench, did you ever say anything to him during that time?

A. ***  [T]he only thing I remember is telling him to put his hands behind his back. I—I can't remember if I told him that he was under arrest at the time.  I'm fairly confident I did though.

Q. But you did tell him to put his hands behind his back?

A. Yes.

Q. And did he do that?

A. No."

¶ 13    Ortiz testified as follows.  On arriving, he attempted to speak with defendant, who was uncooperative.  The other officers went elsewhere.  Eventually, Zuniga came downstairs, and the officers started to leave.  Dezi mentioned that defendant had been evicted.  Zuniga turned to speak with her, but defendant stood in his way.  Ortiz escorted Dezi out of the way and spoke with her.  Defendant kept his phone raised and pointed at Zuniga's face.  He was not cooperating with Zuniga's commands.  Ortiz's testimony continued:

"Q. And what did you observe after the defendant was becoming uncooperative and not listening to the commands of Officer Zuniga?

A. The proximity between the defendant and Officer Zuniga closed *** Officer Zuniga was requesting that he step back.  The defendant continued to raise his voice and refused to step away, at which point Officer Zuniga extended his arm to gain distance.  The defendant smacked Officer Zuniga's hand out of the way, to which Officer Zuniga initiated an attempt to detain him and arrest him.

Q. Did you at any point hear Officer Zuniga place [defendant] under arrest?

A. Yes.

Q. And how would you describe that?

A. So prior to the incident, he said, 'If you step up to me again, you're going to be placed under arrest.'  At that point is when he placed his hand on Officer Zuniga.  Officer Zuniga approached him, and *** brought him to the kitchen table, to which I jumped in and attempted to place the defendant's hands behind his back."

Ortiz could not recall whether "anyone [gave] any lawful commands to the defendant at that time." Ortiz also could not recall whether he told defendant to put his hands behind his back or told him he was under arrest.  When defendant was brought to the kitchen table and sat on the bench, he

still had his phone in his left hand. His left arm was "stiff" and "extended out." When Oritz attempted to place defendant's left arm behind his back, it "remained stiff to prevent [Ortiz] from maneuvering [the] arm." The officers struggled with defendant. They all ended up on the floor. Ortiz placed defendant's arms behind his back. The officers handcuffed defendant and escorted him outside.

¶ 14    The State rested.

¶ 15    Defendant introduced part of Zuniga's body camera video. That portion began with Dezi telling the officers that defendant and his father had gotten into an argument; that Dezi intervened; and that defendant, who was drunk, verbally abused her. After Dezi and Zuniga went upstairs, he obtained more information and told her he could not force defendant to leave the house. The rest of the video showed the confrontation between Zuniga and defendant.

¶ 16    After hearing closing arguments, the trial court stated as follows. To prove the charge of resisting a peace officer, the State had to prove that (1) Zuniga was a peace officer, (2) defendant knew him to be so, and (3) defendant knowingly resisted the performance by Officer Zuniga of an authorized act within his official capacity. See 720 ILCS 5/31-1(a) (West 2020). The first two elements were satisfied, as both Zuniga and Ortiz were in full uniform, including patches identifying themselves as police officers.

¶ 17    On the third element, the trial court noted that the State had to prove that defendant materially impeded Zuniga's attempt to perform an authorized act within his official capacity. Defendant was charged with three unlawful acts: (1) defying a lawful order to step back from Zuniga, (2) making contact with Zuniga's right arm, and (3) refusing to place his hands behind his back after being told that he was under arrest. The court found that the first two acts did not

constitute resisting an officer because they did not materially impede Zuniga's ability to perform an authorized act.

¶ 18    Turning to the third alleged act, the court noted as follows.  Dezi, the homeowner, consented to Zuniga's entry into the house and his presence throughout the incident.  As Zuniga and Ortiz attempted to talk with Dezi, defendant interposed himself between the two.  Zuniga moved forward, and Dezi slid past defendant to continue to talk to Ortiz.  Zuniga and defendant argued, and there was "contact between the two."  Zuniga told defendant to step back, and defendant told Zuniga to step back.  Zuniga told him, " 'You come up to me again, you are going to jail.' "  Zuniga put his right hand on defendant's chest, "ostensibly to maintain distance between the two."  In response, defendant grabbed Zuniga's wrist and moved Zuniga's hand down.  Zuniga then pushed defendant onto the bench.  The officers told defendant several times to put his hands behind his back.  Defendant's left hand was "palm-side down on the bench seat" and his left arm was "straight and unmoving."  Despite the officers' commands, defendant refused to move his left hand from the bench.  Ortiz and Zuniga took him to the floor and finished handcuffing him.

¶ 19    The trial court stated that the first issue was whether defendant knew that he was being placed under arrest.  Zuniga never told defendant, "You are under arrest."  However, Zuniga had warned defendant that, if he "[came] up to [Zuniga] again," he would go to jail.  When defendant swatted Zuniga's arm, he might have committed a battery, which is an arrestable offense.

¶ 20    The trial court found that "[i]t [was] clear from the video that the defendant [knew] what [was] occurring."  While the officers attempted to handcuff him, he kept "verbally sparring" with them, showing that he was "unwilling to recognize the officers' authority."  Defendant kept his left arm extended with the palm flat on the bench.  The court concluded that

"defendant knew he was being placed under arrest and he resisted the efforts of Officer Zuniga to affect [*sic*] the arrest by refusing to place his left arm behind his back, and, in fact, keeping that arm in a rigid position with his palm flat on the bench seat. *** The defendant had the ability to comply with the officer's directives but disregarded them. *** [T]he State has proven beyond a reasonable doubt that the defendant committed the offense of resisting a peace officer."

¶ 21 The trial court denied defendant's posttrial motion and sentenced him to 12 months' conditional discharge. This timely appeal followed.

¶ 22                                  II. ANALYSIS

¶ 23 On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of resisting a peace officer. He argues that the State failed to prove that he (1) acted knowingly or (2) materially impeded Zuniga's performance of an authorized act within his official capacity.

¶ 24 The State has moved to strike portions of defendant's statement of facts as improperly argumentative. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). We deny the motion, as we have thoroughly reviewed the record and shall rely on our independent assessment of the evidence.

¶ 25 We turn to the merits. In evaluating the sufficiency of the evidence, we ask only whether, after viewing the evidence in the light most favorable to the prosecution, any reasonable fact finder could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002). The credibility of the witnesses and the weight given to the evidence are within the prerogative of the fact finder. *People v. Holmes*, 141 Ill. 2d 204, 242 (1990). We must allow all reasonable inferences from the evidence in favor of the prosecution. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 26 Section 31-1(a) of the Criminal Code of 1961 (720 ILCS 5/31-1(a) (West 2020)) provides: "(a) A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity commits a Class A misdemeanor." Defendant was charged with and found guilty of violating section 31-1(a) in that he refused to place his hands behind his back after being told he was under arrest. Thus, the "authorized act" that he was alleged and found to have resisted was an arrest.

¶ 27 A person acts "knowingly" if "he or she is consciously aware that [the] [relevant] circumstances exist." 720 ILCS 5/4-5 (West 2020); see *People v. Borders*, 2020 IL App (2d) 180324, ¶ 53. "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." 720 ILCS 5/4-5 (West 2020). "A person is not authorized to use force to resist an arrest which he knows is being made *** by a peace officer ***, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." *Id*. § 7-7; see *People v. Janosek*, 2021 IL App (1st) 182583, ¶ 47.

¶ 28 Defendant argues first that the evidence did not prove that he *knowingly* resisted arrest. He argues second that the evidence did not prove that he materially impeded the arrest. Because we agree with defendant's first argument, we reverse without reaching his second argument.

¶ 29 Defendant argues that the trial court erred when, despite finding that Zuniga never specifically told defendant he was under arrest, the court concluded that defendant was aware that he was being arrested when he resisted. Defendant argues that the court improperly relied on Zuniga's warning that, *if* he "came up on [Zuniga]," he would be arrested ["going to jail," as Zuniga said]. According to defendant, the bodycam videos show that, after this warning, he did not "come up" on Zuniga but only slapped away Zuniga's hand. Thus, he concludes that although

he resisted the handcuffing, there was insufficient proof that he knew he was resisting an arrest. We agree.

¶ 30    In *Borders*, a jury convicted the defendant of resisting arrest by Officer Heath.  *Borders*, 2020 IL App (2d) 180324, ¶¶ 1, 17.  Most of the evidence from *Borders* in this paragraph came from the bodycam videos of Heath and Officer Laurent.  At about 5:17 a.m., Heath and Laurent were outside the defendant's house responding to a hangup 911 call.  *Id.* ¶ 4-5.  The defendant's sister answered the door and met the officers outside.  *Id.* ¶¶ 4-5, 8.  A few minutes later, the defendant came down, let his sister inside, and stepped onto the porch with the officers.  *Id.* ¶¶ 8, 12.  Shortly afterward, he asked permission to go inside to get his shoes and socks, and started toward the door.  *Id.* ¶ 14.  Laurent told him to stay outside and put his hand on the defendant's arm to restrain him.  *Id.*  Heath told the defendant that the officers wanted the defendant's sister to come to the door to talk to them.  *Id.*  The door closed, and the defendant was still outside.  *Id.*  We continued:

> "Held by Laurent on the steps, [the defendant] again asked to go in to get shoes and socks. A second later, Heath began moving quickly toward [Laurent and the defendant], stating, 'No, we're done playing games.'  As [the defendant] was grabbed by Heath, [he] shouted, 'sir' and 'lock the door, man.'  Heath and Laurent forced [the defendant] to the ground, yelling at him to put his hands behind his back.  \*\*\*  Heath and Laurent testified that [the defendant] struggled and did not comply with their demands to stop resisting and put his hands behind his back.  [The defendant] denied this, testifying that he did not struggle and that the officers were hampered in bending his arm to handcuff him because Heath was kneeling on his shoulder.  It is undisputed that Heath had [the defendant] in handcuffs within 45 seconds of beginning to move toward him.

As Heath escorted [the defendant] to the police car, [the defendant] asked again whether he could get some shoes. Heath told him no. *** Heath said that [the defendant] was the one being arrested because he was 'resisting our attempts to investigate this[.]' " *Id.* ¶¶ 15-16.

¶ 31 Heath testified that he decided to arrest the defendant after he closed the door, preventing the officers from entering the house. *Id.* ¶ 19. Heath admitted that he had not ordered the defendant to move out of the way, open the door, or let the officers inside. *Id.* Heath initially testified that he had told the defendant that he was under arrest before grabbing him, but Heath was impeached by the bodycam videos, which showed that he told the defendant only that " 'we're done playing games.' " *Id.* ¶ 20. The videos showed that Heath did not tell the defendant that he was under arrest until after the handcuffing. *Id.*

¶ 32 Laurent testified that the defendant repeatedly stated that he had been asleep and did not know what was happening in the house. *Id.* ¶ 21. Laurent further testified that, when he told the defendant to stay outside and put his hand on his arm to restrain him, he was trying to detain the defendant but not arrest him. *Id.* Laurent stated that, after the defendant was handcuffed, "someone told [him] that he was under arrest." *Id.* ¶ 22.

¶ 33 We reversed the defendant's conviction because the State failed to prove knowledge. *Id.* ¶ 59. We noted that, by the time Heath told the defendant they were " 'done playing games,' " he had decided to arrest the defendant. *Id.* ¶ 52. Further, "no one told [the defendant] that he was under arrest until the struggle was over and he was lying on the ground handcuffed. One cannot knowingly resist an arrest until one knows that it is occurring." *Id.* ¶ 54. We rejected the State's argument that, by telling the defendant to put his hands behind his back, the police adequately informed him that he was being arrested. *Id.* ¶¶ 55, 57. Although the police did not need to utter

the term " 'under arrest,' " they had to enable a reasonable innocent person to understand their intent. *Id.* ¶ 56. We explained:

> "[T]here was no evidence that [the defendant] had been awake for more than five minutes when, despite the fact that he was voluntarily cooperating with police requests that he speak with them, he was restrained from reentering his home. *Less than 10 seconds later, without telling him that he was under arrest*, Heath and Laurent grabbed him and forcefully put him on the ground. Moreover, [the defendant] had not committed any crime, nor did the police have probable cause to believe that he had committed one. He was in handcuffs less than 45 seconds after Heath began moving toward him. Given all of this, we think that it would have taken a reasonable person in [the defendant's] situation most, if not all, of that time to realize that he was being arrested. *** Further, *** [the defendant] was not told that he was under arrest until after he was handcuffed." (Emphasis added.) *Id.* ¶ 59.

¶ 34    Although there are pertinent factual distinctions between *Borders* and the present case, the similarities are persuasive. To be sure, defendant here was wide awake and had been uncooperative with Zuniga before he was taken to the bench and handcuffed. Arguably, defendant had committed a battery against Zuniga, although there is no evidence that Zuniga intended to arrest him for that offense (notably, Zuniga's complaint did not charge battery). Nonetheless, in our view, the bodycam videos make it impossible to find beyond a reasonable doubt that, before Zuniga initiated the arrest, defendant knew that he was under arrest.

¶ 35    The trial court relied on Zuniga's warning, " 'You come up to me again, you are going to jail.' " But this statement informed the defendant only that *if* he moved closer to Zuniga, he *would* go to jail. When he issued that warning, Zuniga had already stepped forward and was face-to-face with defendant with his hand on defendant's chest. The court's inference that Zuniga was trying

to put distance between himself and defendant was not reasonable; Zuniga had closed that distance by his own choosing. Moreover, the act that *immediately* triggered the arrest was defendant's touching of Zuniga's arm while the two were barely apart and defendant remained in place. Less than a minute of loud confusion elapsed between this act and the completed arrest.

¶ 36    Nor did the officers' restraint of defendant put him on notice that he was being arrested. As in *Borders*, the handcuffing itself was not a valid basis for finding that the officers intended to arrest defendant, much less that they communicated this intent to him. Defendant could reasonably have believed that he had been pushed onto the bench and was being handcuffed to prevent further physical contact between him and Zuniga.

¶ 37    The State relies on *People v. Thompson*, 2012 IL App (3d) 100188, ¶ 1, which affirmed the defendant's conviction of resisting arrest. The State contends that *Thompson* is on point because there, as here, the defendant "was informed that he was subject to arrest." This attempt to equate the cases semantically overlooks crucial differences in substance.

¶ 38    In *Thompson*, the State proved that uniformed law enforcement officers legally entered the defendant's house. *Id.* ¶ 5. Without provocation, the defendant thrust his shoulder into one officer's chest. *Id.* The officer immediately grabbed him and explicitly told him that he was under arrest for battery. *Id.* ¶ 6. To handcuff the defendant, the officer placed him in a submission hold and took him to the ground. *Id.* While they were on the ground, the defendant resisted the handcuffing and swung his elbow toward the officer's head several times. *Id.* Another officer helped to complete the arrest. *Id.*

¶ 39    From the court's analysis, it is evident that the knowledge element was not at issue on appeal. The defendant sought reversal based solely on his trial testimony (*id.* ¶ 15), which was that he did not resist the arrest at all (*id.* ¶ 9). Thus, the State's reliance on *Thompson* is wholly

misplaced. Moreover, because the State in *Thompson* had proved that the officer explicitly told the defendant that he was under arrest before handcuffing him, *Thompson* is easily distinguishable. Indeed, in *Borders*, we distinguished *Thompson* on this very basis. See *Borders*, 2020 Il App (2d) 180324, ¶ 54.

¶ 40                                III. CONCLUSION

¶ 41    For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 42    Reversed.